## PENNSYLVANIA R. CO. v. BOURKE.

### No. 6007.

Circuit Court of Appeals, Sixth Circuit.

Nov. 9, 1932.

W. N. Snow, of Grand Rapids, Mich. (Knappen, Uhl, Bryant & Snow, of Grand Rapids, Mich., on the brief), for appellant.

Charles F. Hext, of Grand Rapids, Mich., for appellee.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

MOORMAN, Circuit Judge.

This is an appeal from a judgment in damages recovered by the appellee for the death of her husband, Joseph D. Bourke, while employed as a brakeman in the service of the appellant in its yards in Grand Rapids, Mich. The appellant is a common carrier engaged in interstate commerce, and the deceased was employed in such commerce at the time of his injury. From January 1, 1928, to the date of the accident, September 7, 1929, he was regularly employed as a member of a switching crew whose work consisted of the storing of cars and the assembling of others into trains in the Grand Rapids yards. One of the nightly duties of this crew was to switch the cars of a certain train arriving at Grand Rapids about 8:15 p. m. to the coach yards or storage tracks, some distance south of the station, and to assemble other cars into a train for the same run the next day. The track leading to these yards was known as a lead or ladder track. Immediately east of and parallel with this track as far south as a switch was the southbound running track. Beginning about the switch, the lead track curved to the southwest. The coach yard tracks diverged from the lead tracks south of the switch. On the night in question the crew proceeded from the Union Station southwardly over the switch, placed a car on one of the coach yard tracks some distance south of the switch, and then pulled up to place a car on the transfer track, the first track south of the switch.

It was Bourke's duty to signal the engineer when the cars had cleared the switch and to throw the switch for the transfer track. He was riding on the first car next to the engine. As the engine approached the switch an N-2 type of engine was proceeding south on the south-bound running track. Bourke alighted from the car on which he was riding into the space between the two tracks and, while standing there, was struck either by his own cars or the engine on the adjacent track.

The N-2 engines were larger than other types of engines used in the appellant's yards at Grand Rapids. The overhang on the N-2 engine at the cylinder casing and guide yoke was 1⅞ to 3⅛ inches greater than at the same point on the smaller engines. This overhang, however, extended only about 9 feet back of the pilot beam, and the other parts of the engine, including the tender, did not differ materially in width from the corresponding parts of smaller types of engines. The overhang of cars moving on the lead track was greatest at the point of the curve. From the switch point south for some distance the clearance between any type of engine on the south-bound running track and cars on the lead track was at most narrow. Where the overhang on the lead track was least, the clearance between an N-2 engine on the south-bound track and coaches on the lead track was from 31⅜ to 34½ inches, at the point where the overhang was greatest it was from 18⅜ to 21⅛ inches.

The only witness who saw Bourke at the instant of the accident was the engineer on the N-2 engine. He testified that Bourke was not struck by the cylinder casing or the guide yoke, but sustained his injury after the wider part of the engine had passed him. It is not contended by the appellee that Bourke did not see the engine approaching. The contention is that he saw it, and, not being advised that such type engine would be used on that track or that it was wider than the smaller engines, took a position at a point between the tracks which would have permitted a smaller engine to pass without striking him, but which was so close to the N-2 engine that the additional overhang of the cylinder casing or the guide yoke struck him in the forehead and caused his injury and death. It was upon this theory that the case was submitted to the jury.

It is difficult to see how the use of facilities or equipment which vary slightly in width, but which are commonly used, may be made the basis of an action for negligence. It is contended by the appellant, too, that even if it were negligence to operate the N-2 engine on this track at the time of the injury, the testimony of the engineer of that engine raised such doubt as to whether the injury was caused by a negligent or nonnegligent act as to require the court to direct a verdict for the defendant. Burnett v. Pennsylvania R. Co., 33 F.(2d) 579 (6 C. C. A.); C., M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 478, 46 S. Ct. 564, 70 L. Ed. 1041; New York Central R. R. Co. v. Ambrose, 280 U. S. 486, 490, 50 S. Ct. 198, 74 L. Ed. 562; Atchison, etc., Ry. v. Saxon, 284 U. S. 458, 52 S. Ct. 229, 76 L. Ed. 397. We pass these questions as not necessary to a decision of the case.

The deceased knew that the south-bound track was used for trains and that trains were passing over it at all hours. Every night at about the same hour for a month and a half an engine of the N-2 type had passed down this track. He must have known also that there were several types of engines of varying widths at work in the yards. He could not have failed to observe that there was a greater overhang from cars at the point of a curve than on a straight track. It would have been apparent to any one who observed the conditions surrounding the work he was doing that the space between the south-bound running track and the lead track was narrow. He had not only seen the N-2 type of engine but had "looked it over" in the roundhouse and knew that it was larger than some of the other engines working in the yards. He knew from general orders which were issued and which he was required to paste and did paste in his time-table that these engines had been in use in the yards for more than six weeks. Knowing all these things, he alighted from his train when it was apparent that an engine was approaching on the adjacent track, and when the space between a smaller engine on that track and his train at the point of the curve of the lead would not exceed 22½ inches. The narrowing of this clearance by 1⅞ to 3⅛ inches did not make the difference between safety and hazard. Cf. C. & O. Ry. v. Leitch, 276 U. S. 429, 430, 48 S. Ct. 336, 72 L. Ed. 638. Besides, having seen the N-2 type of engine in use in the yards, he cannot be supposed to have been ignorant of its width or to have had reason to assume that it would not be used on the south-bound track. Furthermore, he was not bound to alight from the train at that point, but could have waited until the rear car

passed over the switch, or could have got off, as was not unusual, upon the fireman's side and given his signals to the fireman to be transmitted to the engineer. It is true it was possible for him to stand in the space between his train and an engine on the south-bound track without injury, but the risk of doing so, whatever the size of the engine, was obvious—so obvious that it must be held to have been assumed. Grand Trunk Western Ry. Co. v. Reid, 42 F.(2d) 403 (6 C. C. A.); Southern Pac. Co. v. Berkshire, 254 U. S. 415, 41 S. Ct. 162, 65 L. Ed. 335; Ches. & Ohio Ry. v. Nixon, 271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914; Toledo, St. Louis & Western R. R. Co. v. Allen, 276•U. S. 165, 48 S. Ct. 215, 72 L. Ed. 513.

The judgment is reversed, and the cause remanded for a new trial.